v. Eric H. Holder, Jr., Attorney General, and No. 13-1994, Leticia Castaneda v. Steve Sousa, etc. Thank you. Ms. Perez, good morning. Good morning, Your Honors. May it please the Court, Eliane Perez on behalf of the government. Will you speak up into the microphone? I think we probably can hear your argument better. Okay. Is this better? Yes, ma'am. Thank you. Your Honors, the government is here to urge this Court to reverse the District Court's decisions in both Gordon and Castaneda because those decisions erroneously held that the government cannot act pursuant to the mandatory detention provisions of 8 U.S.C. 1226C when the government does not take a criminal alien into custody immediately upon release from the alien's criminal custody. Therefore, the District Court's decisions sanctions the government for not complying with the timing requirements of this statute. Here, we urge the Court to follow the decisions of the Third and the Fourth Circuits, which have held that the government does not lose its authority to impose mandatory detention pursuant to the provisions of 1226C if it cannot take a criminal alien into custody immediately upon that alien's release. The Third and the Fourth Circuits in both Hodge and Sylvain rely on the rule of statutory construction that affects the realities of government action and is practical. That rule establishes that if the statute in question does not clearly specify a consequence for noncompliance with the statutory timing provisions, the federal courts will not impose their own coercive sanctions. Here, the District Court in both Castaneda and Gordon tried to steer away from this rule of statutory construction and Supreme Court precedent by holding that when the government does not comply with the timing provisions of 8 U.S.C. 1226C, the government does not lose its authority because it cannot act pursuant to the provisions of 1226A. However, it is important to understand that 1226A is a different statute from 1226C. 1226A calls for the discretionary detention of aliens who do not pose a threat to society or a flight risk during their removal proceedings except, and I quote, as provided in subsection C. However, 8 U.S.C. 1226C takes the discretion away from the executive and calls for the mandatory detention of criminal aliens described within that subsection. The Third Circuit's decision in Sylvain speaks to the flaw of the District Court's decisions because the Supreme Court over the years has reiterated the principle that absent a clear congressional directive, a court cannot strip away the executive's power to act if it does not comply with the statute's timing provisions. For example, in Montalvo, Murillo, the Supreme Court held that the government did not lose its authority to act under the bail reform act when the government did not provide a defendant with an immediate hearing upon the person's first appearance before the officer. That statute, subsection F of that statute, provided that the government must conduct an immediate hearing upon a detainee's release pursuant in order for that person to, for the government to decide whether that person was going to be held or released on bond. What is the government's position about these Ninth Circuit decisions, Tihani and I think there are a couple others, as to the length of the detention that's permitted under C and that it can extend for a sufficient period that it becomes unreasonable and that C no longer What is the government's position about that? The government's position in those cases is that the Supreme Court already has held the constitutionality of 1226C. Yeah, those cases come after the Supreme Court decision. And therefore, the Supreme Court indicated in that particular, in that case, in the Moore, that it is constitutional to hold criminal aliens without a bond until the end of their criminal proceedings, of their removal proceedings. I'm not sure that's really what it says because Justice Kennedy's concurrence says that it can become so lengthy that it's unreasonable and outside the statute, which is what the Ninth Circuit cases are dealing with. I was just wondering what the government's position was. Does there come a point where the detention is so lengthy that it's outside of C? Your Honor, in those cases, if the court were to assume that at some point it does become unreasonable detention because it is a lengthy it should be by a case-by-case basis. It doesn't come unreasonable at the six-month mark automatically. And in order for the court to understand, it has to look at the specific factors of each case in order to determine whether the reasons why a particular alien has been in pre-order detention for a period of six months or even more. So you agree that there are circumstances under which C is no longer applicable if the detention goes on too long? No, Your Honor. The government's position is that... You can do it forever. Your Honor, in the Moore, the court realized that pre-removal or detention is not forever. It's not indefinite. And that is something that the court considered when it looked at what the procedures of the government has to follow before an order of removal is actually filed. Suppose the detention went on for four years. Your Honor, that's not the case before this. I understand. In that particular circumstance, you would have to look at the circumstances of that particular case. But at this moment, there hasn't been a case, not to my knowledge, where pre-order detention would be for four years under Section 1226. But I know that the California cases did involve such circumstances. Are you not familiar with Tahani and the other cases? Yes, Your Honor, I am. And in those circumstances, our argument in those cases is that the due process clause is very flexible. And as a result, you have to look at each particular case. And even in the Moore, the alien there was in detention for over six months. And the court didn't say at the six-month mark it becomes unreasonable simply because it has been six months. In that particular case, the Supreme Court looked at the different factors as to why that person had been in detention for that long and actually acknowledged the fact that the alien had asked for continuances and that the alien wanted a relief from removal. And the court looked at those factors and said, it's not the government's fault as to why this person has been in pre-order detention for so long. So if pre-order detention did become unconstitutional at the six-month mark, the Supreme Court didn't tackle that issue in that case and actually inferred that you have to look at every case, case by case. So there are some cases in which C wouldn't be applicable anymore because of the length of the detention? Well, Your Honor, if I'm understanding your question correctly, I understand that the Ninth Circuit has ruled that after a certain period of time, if you are in pre-order detention, that you need a bond hearing at the six-month mark. Whether the court construes that the bond hearing should be pursuant to subsection A or subsection C, a bond hearing is nonetheless required. It doesn't necessarily have to be under subsection A. It could also be under subsection C like other courts in this circuit, other district courts in this circuit have ruled. What is ambiguous about the term released as used in subsection C? Well, the phrase when released is really what that's the point. That's really what I meant. Yeah. It is ambiguous because as the court in the Fourth Circuit and Hodge clearly described, depending on the dictionary that you look at, it could mean when the duty arises or it could mean immediately. When released. I don't think you can find when released in the dictionary. You may find released, but not when released. Well, here we're looking at the word when. And when an alien is released, does it mean immediately after the alien is released? No, you're adding. There you're adding to when released. You could say if you follow your argument, at least as I follow your argument, you could say when released means five months after release. Why is that any different than saying when released means immediately after? When released would seem to me to be immediately after when released. Well, Your Honor, it is the government's position that in this case the term when released doesn't speak to, it doesn't call for an immediate, it doesn't have an immediacy requirement. It really calls to the duty of when the government should take a criminal alien into custody and when that duty arises. It doesn't necessarily mean that the government must be at the jailhouse steps in order to take an alien that has been released. It actually It seems to me difficult to read the history of this statute as meaning anything other than to take the alien into custody immediately. That's what Congress wanted to have happen. If you adopted a practice of waiting six months in all of these cases to detain the alien, you would think Congress would be pretty unhappy about that. Your Honor The statute reads as though they're directing you to take them into custody immediately, right? Your Honor, even if we were to assume that that is the case, that when released requires immediacy, this court should rule on behalf of the government because, again, as the Supreme Court has reiterated over the years, when a statute calls for deadlines, and even when they're explicit deadlines, when they're 12 months or 30 days or 90 days, these deadlines are construed, unless otherwise instructed in the statute, to be advisory deadlines, and they're not jurisdictional deadlines, meaning that there have been cases before the Supreme Court and in other circuits where the statute calls for the, for example, Secretary of Labor to act within 128 days. In that particular case, it was Brock v. Pierce, where the Supreme Court held that, although the Secretary of Labor did not act within that statutory period, his failure to comply with the temporal limitations of the statute did not deprive him of his duty or ability to act. And the reason why is because in order for the courts to strip from the executive the power to act within a statute, Congress needs to specify that if, Congress needs to specify that the government cannot act. You're sounding as though you're conceding the point that Judge Joy and I were asking about, that the statute really does mean take the alien into custody immediately. We're not conceding that point, Your Honor, but I think that that... Given the history of the statute, how can it mean anything other than that? Your Honor, I think that the biggest indicator that the statute is, in fact, ambiguous is the fact that all these district courts throughout the nation have different decisions as to what the actual term, when released, means. We have district courts looking at the statutory history and interpreting what Congress wanted. The only look at the statutory history, to begin with, is the language is ambiguous. And I still don't understand how it is ambiguous. Your Honor, and again, other courts have looked at the language and have said, when released clearly does not mean, it's a duty. It's not necessarily a jurisdictional timing requirement. And that's the problem, Your Honor. The fact that all these different courts have actually come into, have held different things. We're asking that the court look at that as primary evidence of why the statute is, in fact, ambiguous. And again, even if you look at the dictionary, when can mean at the time of, or it can mean immediately when. Immediately. So it depends on exactly what the court is looking at and is concerned. However, if the court feels that there's no question that that is a timing deadline and it requires immediacy, again, Supreme Court precedent shows that unless otherwise instructed by the statute, the court cannot impose on the executive a sanction for failure to comply with statutory deadline. And again, this case is very, very similar to the Motava Morillo case. In that case, that was exactly what the detainee in that case was saying. He's saying that the statute called for an immediate hearing. And the court said, we understand that the government didn't comply with the immediacy requirement of that hearing. However, the statute did not have, the language of the statute did not have language penalizing the government for failure to comply. And therefore, the court held, the Supreme Court held that it was not penalizing the government because it didn't provide that detainee with a hearing immediately thereafter. In light of the A provision, which allows the government to argue against release, I'm having trouble trying to understand how that's a penalty against the executive. Can you please repeat your question? A provision allows the detainee to have a hearing, but it also allows you to argue against the detainee's release on bond. And I think that's what the district court said, that you have, that it's not a penalty because the government nonetheless has another provision which would accomplish, which could accomplish the same goal of detention. Yes, Your Honor. But we have to understand that, again, 1226A and 1226C are two different statutory provisions. And right now we're looking and interpreting the language of 1226C. And 1226C does not impose upon the government a penalty for not complying with the timing requirements of that statute. Now, if we're interpreting the except that's provided in subsection C, which is found in 1226A to be a sort of penalty, that's not a clear enough language to penalize the government for not complying with the timing requirements. And so that's the reason why we're asking that this court follow the Supreme Court president and say, look, under 1226C there is no discretion. There's no discretion to release aliens on bond pursuant to the provisions of that statute. And that is the statute that's before the court. The problem with not reading immediacy is that it implicitly is giving the agency discretion. Because in these situations you've allowed these people to remain in the community for years, therefore exercising some kind of discretion not to take them into custody immediately. Your Honor, the discretion, once removal proceedings have begun, there is no discretion to release aliens on bond. And that is what the statute calls for. Where does C talk about when a removal proceeding is initiated? It doesn't say that on the basis. It does, but that's what the statute actually calls for. It calls for bringing a criminal alien into immigration custody for the purpose of initiating immigration proceedings. Now, again. It doesn't have to be a situation in which the proceeding is already initiated when the person is taken into custody, right? I'm sorry, Your Honor, can you please repeat that? Well, the reason I'm asking this question is in your brief you say that the government can exercise discretion by deciding not to initiate removal proceedings. And you seem to say that under those circumstances C wouldn't apply. And I'm just wondering where you get that out of the language of the statute, because it seems to me that C doesn't depend on the prior initiation of removal proceedings. Your Honor, it is within the government discretion to and prosecutorial discretion to decide whether or not to initiate removal proceedings. But once the government But your view is you have no authority to pick somebody up unless removal proceedings have been initiated. And that is exactly what the question here. The initiation Is that your position? Yes, right here. You do not have authority under C unless a removal proceeding has been initiated. Well, that is what the statute calls for. The purpose of the statute is to hold these aliens during the pendency of removal proceedings. And as such, there will be no other reason why these aliens would be in custody under 1226C if removal proceedings have not been initiated against that alien. So if a person is released on X day, and as is one of the cases here, five years elapses before you decide to initiate proceedings, that doesn't make any sense in terms of what Congress intended, which was to detain persons it presumed to be harmful. Your Honor, there are many reasons as to why the government cannot hold criminal aliens immediately after they're released from criminal custody. As we stated in our briefs, there are circumstances where the states don't even want to acknowledge a detainer by the government or don't want to share an alien's information with the government. But you're also saying that if the government, notwithstanding those issues, just is dilatory for five years. Exactly. Your Honor, depending on the circumstances of each case, but even assuming, for example, as in Hodge and in Sylvain, where there was a four-year gap, once the government actually decides to initiate removal proceedings against a particular alien, that's when the government's duty arises under 1226C to hold that alien until the pendency of their removal proceedings, until they decide whether or not that alien will stay in the country. And that is the reason why 1226C was enacted. And yes, we understand that the court is concerned from uprooting these individuals from the community, but those were the factors that Congress also considered when it decided to enact 1226C. And the Supreme Court did uphold the constitutionality of that statute. And looking at the realities of government practice and the realities that, again, there will be circumstances in which the government cannot be at the jailhouse steps to take a criminal alien into immediate custody. The court should rule that even when the government cannot and does not take a criminal alien into custody, immediately upon their release from criminal custody, the government can still act pursuant to the provisions of 1226C, and it doesn't now revert to the discretionary provisions of 1226A. Have removal proceedings – maybe I missed something. Have removal proceedings been started in these two cases? Your Honor, yeah. One of the cases, removal proceedings were initiated. One is still pending, and the other one has been administratively closed for reasons that I can't publicly disclose on the record. Is any of this in the record? I think that those – the latest developments in the removal proceedings happened after briefing was completed. Were all the removal proceedings initiated before they were picked up? The removal proceedings were initiated once they were picked up. After they were picked up. They were picked up, Your Honor, and they were served. The purpose of the government picking them up is to serve them with notices to appear and initiate removal proceedings. So, well, did you pick them up and then release them, or did you pick them up and keep them? We picked them up and kept them. So they're – okay. Thank you. Thank you. Mr. Siegel, good morning. Good morning, and may it please the Court. Matthew Siegel for Mr. Gordon. There are three core features of Section 1226 that confirm that Mr. Gordon and Ms. Castaneda are subject to discretionary rather than mandatory detention. First, as the BIA conceded in matter of Garcia-Ariola, this Court has already rejected the BIA's view that the when-release clause of Section 1226 is irrelevant to determining who is subject to mandatory detention. CESANA held, and the plain language of Section 1226 confirms, that mandatory detention applies only to people who are detained consistent with the when-release clause. I heard nothing about CESANA in the government's opening argument, so I will not say more about that unless the Court has questions. What is your view as to what when-release means? One of the difficulties I have is there doesn't seem to be any basis for drawing a line between picking the person up 24 hours later or 48 hours later or five years later. Where would you draw the line? What does the statute require? What is the time that the governments allow?  I have two responses to that, Your Honor, one that's practical and one that's more fundamental. The practical point is that where we would draw the line is a very narrow window, but we're not far apart from the BIA on that subject. We would say immediately, right as the person is being released, the BIA in matter of Rojas concluded that a two-day gap did not qualify as detention when released. So we know we're not far apart from the BIA on that subject. The more fundamental point is that the government's arguments in its brief about that line drawing are a distraction from the fact that there are two competing and fundamentally incompatible definitions of when being offered to this Court, one that has no time limit at all and one that has a time limit. And just because the time-limited one requires some degree of line drawing within a 48-hour period doesn't... You'd say 48 hours, if they have 48 hours in which to pick the person up, and if they do it later, then they come under A? Well, our view is immediately, but there may be room for the BIA to... Not immediately meet. Well, our view would be at the moment of release. From state custody to federal custody, there can't be any gap? That's our view, Your Honor. But, again, the BIA may well have some discretion to decide to clarify that point. And if the BIA were to say, well, actually one day is good enough, it would probably be a harder argument for me to come in here and say that that view is not entitled to Chevron defense. Your view is they're supposed to work under Chevron to come up with an interpretation of what immediately... Right. What the BIA can't do is substitute a completely different definition of when. So, for example, if someone tells me to pick up lunch when I'm done with this argument, there might be some discretion or some room for discussion about whether I have five minutes or 30 minutes or an hour. But if I show up with a pizza in five years or 50 years and say, well, I thought when just meant after, I'm mistaken. And so that's why what I say is there's some line drawing within the time-limited definition, but there's no serious dispute that when has a time limit in this case, and it's a time limit that's pretty short. It seems to me, maybe this is not a legal thought, but it's not illegal either. It seems to me that your position, and I would say generally the position of people in your client's case, would be benefited by the government's argument because if you have an immediate hearing, particularly with the record of one of these defendants, which I think has been convicted of drug charges, et cetera, they benefit by the fact they don't have an immediate hearing because an immediate hearing would probably lead to their being detained immediately. It's true that there is a certain kind of benefit, and there's a reason why we brought the case, Your Honor. But that goes back to the purposes behind mandatory detention. And that's because at the moment of release, Your Honor, that's when the government is least able to predict who will be a risk of flight or dangerousness and who is not. And that justification falls away when the government comes to get someone four and a half years later, as they did with Mr. Gordon. At that moment, there's a record on which an immigration judge can make a pretty easy determination about whether someone presents a risk or not. So, but Your Honor's more fundamental point goes to this, the government's argument about loss of authority. The government didn't put up much resistance on the meaning of the statute, but it says that there's some loss of authority that justifies overcoming that meaning. And that's not, first of all, that's not how the loss of authority doctrine works. It's what this court called in Shield a background interpretive presumption. It can't overcome the plain meaning of the statute. And here there's no loss of authority at all, and no lack of ambiguity. Section 1226 specifies that the discretion of A applies when mandatory detention does not. And when mandatory detention does apply, it's a constriction of the government's authority. In contrast, the loss of authority cases all involve something that the government was supposed to do, by a certain point, did not do, and then someone came to court and said, the government can't do that thing anymore. Well, here the thing that the government was supposed to do was to take Mr. Gordon into custody. And no one here is arguing that the government's authority to take someone into custody evaporates when the run-release period expires. No one is arguing that. Nor are they arguing that the government loses the discretion to decide what to do with noncitizens once they take them into custody. It's actually more powerful for our side than you suggested, Judge Thompson. It's not just that they can argue for detention. They get to decide. It's the government who has decided to release Mr. Gordon on bond. He's with his family right now on the government's authority. This might be a harder case for me if I said, well, as soon as the run-release period elapses, there's no taking Mr. Gordon into custody anymore. But that's not our argument in this case. That's what separates it from the loss of authority. But what the government is arguing, they're saying, even if we read the statute, it's saying we're supposed to take the person into custody immediately, which I think is probably the correct reading of the statute. They're saying that Congress wanted us to take that person into custody later, even if we'd gone past the time limit, and to proceed under seat. I guess they would say, you have this father picking up the daughter at school example. Well, yes, the father is supposed to pick the daughter up at school immediately after school, but nobody would suggest that the father's failure to pick the daughter up immediately would mean that the daughter shouldn't be picked up at all. And so what they're saying is the time limit wasn't meant to benefit the alien. It was a statutory time limit directed to telling the government to do a better job of picking these people up. So what's your response to that? Well, a few responses. One, I'll use the hypothetical, and one I want to return to the statute. In the hypothetical, timing can matter. So if the instruction is pick our daughter up from school and then take her to soccer practice, right, don't release her, would be the instruction from 1226C2. If the pickup happens five hours later, taking to soccer practice might not be the right thing to do. So it matters what the timing actually was, and that's a reason to give discretion. And the other thing, Your Honor, is you said you think the government would say. Well, the government did make precisely those arguments in CESANA, and CESANA rejected them. It cited two cases by district courts reaching precisely the holdings that are being challenged in these cases. That's Oscar v. Gillen and Quesada Buccio from Western District of Washington. And what the court said in CESANA was that Congress was not seeking to justify the mandatory detention months or years after the end of someone's incarceration. That's because someone at that moment has, there are fewer reasons to detain them, and because Congress was simply not focused on that fact. It understood when it enacted 1226C that it was dealing with an INS constrained by scarce resources. It did not give INS the additional burden of having to find at-large aliens, which is a totally separate and additional enforcement mechanism. The final point I'd say here is that there is an undercurrent in the government's argument about an inconvenience or an unpleasantness. It says that it's a loss of authority because it doesn't want non-citizens like Mr. Gordon or Ms. Castaneda to have bond hearings, even though they would prevail in them. And the loss of authority doctrine is not a pleasure-maximizing doctrine. It's not a happiness-maximizing doctrine. It's an authority-maximizing doctrine. So a judge who's faced with a defendant having a mandatory minimum sentence might have an easier time at sentencing if the person is subject to a 15-year mandatory minimum. But taking that minimum away, although taking that mandatory minimum sentence away from the defendant would increase the burdens on the sentencing judge. He would have to do more at sentencing. It certainly also increases the judge's authority. Thank you, Your Honor. Thank you. Mr. Romanowski, good morning. Good morning. May it please the Court, my name is Greg Romanowski and I represent Leticia Castaneda, who was uprooted from her community and from her family about five years after the release from her criminal custody. She was then kept in detention for several months while she was screaming in her sleep every night because of the terrible abuse that she had previously been a subject of. And when Judge Young ordered a bond hearing in this case, you know what the government did? They released her. They released her before the bond hearing. So they weren't holding her because she was a danger to the community. They were not holding her because she was a flight risk. They were holding her because they thought that they had the authority to do so. Well, 1226C is not a grant of authority. 1226C is Congress saying to the Attorney General, when certain people are just released from their criminal custody, we do not trust you, the Attorney General, to make the usual determination under 1226A, whether the person is dangerous and whether the person is a flight risk. We have very little information because the person is just released from criminal custody. We have no information. We don't know whether the person is dangerous, and we don't want to find out. We don't want to take that risk. So even if you think the person is not dangerous, even if you don't have enough bed space, we do not allow you to release these people. This is what 1226C does. So to go back to Judge Dyke's hypothetical about the daughter not being picked up at all, it's actually a little bit different. It's the Congress saying if dad cannot pick up the daughter immediately upon the when the classes are finished, then the mom picks her up. If 1226C does not apply, then 1226A does, because it is not when released, it's the general detention provision. So when Judge Young ordered a bond hearing in this case, he actually gave the government the authority to release Castaneda. They could have continued to detain her. They could have continued, the Attorney General through the immigration judge, could have continued to detain Castaneda. If they thought she was dangerous, if they thought she was a flight risk, they could have continued to detain her. Instead, they elected to let her go, because they had the power to do so now, because they had this additional authority to release her. Also, just to echo my brother's comments about Saisana, the fact that this court relied on some very telling language from the Northern District of Washington is also evidence that this court already ruled on this issue. If I may quote the Western District of Washington case, it says, the court is not persuaded that the legislature was seeking to justify mandatory immigration custody many months or even years after an alien had been released from state custody. This is part of the Saisana ruling. And finally, to respond to the government's practical arguments, there's a case, the recent case from the Northern District of California from May 2014, which says it appears that the government's argument is motivated by the fact that the government finds it difficult to comply with Congress's directive. This concern is unavailing. And practical difficulties cannot change or undermine the statute's plain language. And we respectfully maintain that it is clear from 1226C that Congress intended only those who are being just released from their criminal custody to not only be picked up, but to be held without bail. Thank you. Counsel, could you answer Judge Dyke's question? I believe it was Judge Dyke, about the definition of just release, the wiggle room. Sure. Yes. If I may respectfully suggest, the question as to how long is too long is not actually before this court. The question we're trying to decide is whether when released means immediately upon release. And as my brother pointed out, BIA, if BIA wanted to interpret the immediately upon release by saying, well, one hour is good enough, or one day is good enough, they may very well be entitled to Chevron deference. Because this could be a reasonable interpretation of when released. You agree that when released has some ambiguity to it, right, as to whether it means an hour, 24 hours, 48 hours? What I agree with is that BIA's, a possible BIA's interpretation of what immediately upon release is. Their interpretation is irrelevant unless it's ambiguous. You agree that there's some ambiguity in there as to whether it means, you know, 15 seconds later or an hour or 24 hours. I do agree with that, Your Honor. I do agree, and I do think it makes sense given the underlying purpose of the statute. I do think that if the government says 15 seconds is okay, it's practically when released. I think they may be entitled to Chevron deference here, but that's not what they're saying. 48 hours might be good enough, too. Well, the BIA itself said it's not good enough. The BIA in Rojas said that it's clearly not when released. So 48 hours, based on the agency's interpretation, is not good enough. They addressed this question, 48 hours might be good enough. I apologize, Your Honor. It might be a reasonable interpretation of the statute to say that the government has 48 hours to comply with the when released. If they said so, I don't believe that it would be, but I agree that it's an open question, Your Honor. But, again, they specifically said that two days is not good enough in matter of Rojas. It's not immediately upon release. The only other question I would have is, counsel of the government is correct that there are states that are totally non-cooperative states and don't communicate this type of information to the agency. I mean, what do you say? I mean, and, therefore, the government has no knowledge that these people are being released. Again, I understand the practical considerations, Your Honor, but I respectfully suggest that the underlying purpose of the statute does not allow the government to just pluck individuals out of their respective communities five years later. It's just not what the statute is designed to do. The statute is designed to make sure that people, potentially dangerous criminals, who we do not know whether they're going to be dangerous or not, the Congress wanted the government to keep them. Congress did not want to take any chances with these people. Once the individuals are out, once they've been living in their communities for five years, they have some evidence to present that they're not a danger to their community, that they're not a flight risk. Suppose the government doesn't find out about their release for, say, three months. Would you say that Section A applies in that situation also? Yes, most definitely, Your Honor. Three months is certainly not immediately upon release. Would there be any problem in Congress rewriting the statute to adopt the government's position here? Would there be any problem? Yeah, constitutional problem, let's say. Can Congress write the statute the way the government interprets it? We would respectfully suggest that it implicates a very serious constitutional right of not just being free, but a right to ask for bail. When you're talking about somebody not even being able to present an argument of them not being a danger to the community, it's a very serious matter, and I don't see Congress doing that, Your Honor. Thank you. Thank you.